Nott, J.
These cases both depend upon the same principle. In the first, the plaintiff brought his action on a warranty of soundness of a negro woman. In the seconds the breach of warranty was set up by way of defence. In one, the jury found for the plaintiff, in the other, for the defendant. But, in both, they found the property to be unsound. The evidenpe was such as to render them both fit cases for the consideration of a jury, and therefore, as it regards the facts, the rourt would not feel disposed to interfere. But the unsoundness, complained of, was a want ol understanding. And a question has been made whether a warran - ty of soundness embraces soundness of mind as well as body. Wo question of implied warranty ar ises in either case. There ijs an express warranty in both. So that the whole question depends upon the construction of the word “ sound,” in the warranty of a slave. As a general term it is sufficiently comprehensive to embrace both soundness of mind as well as of body. And when we look to the object of a warranty, it is difficult to conceive why it should not apply as well to one as to the other. A warranty of soundness would seem to imply a capacity to perforin the ordinary duties of a slave, *252 Whether the want of capacity arises from want of bodily strength or understanding, the effect is precisely the same.. And there is the same failure of consideration in both cases. The argument is, that the warranty extends only to unsoundness arising from physical causes. Admitting the correct-, ness of that position, it would advance us but a little way towards the solution of the question. For whether unsoundness of mind proceeds from moral or physical causes, or may proceed from both, is a question respecting which, perhaps doctors will disagree. We do know, from actual observation, that a defect of understanding may result from physical causes. A fracture of the skull, or a pressure upon the brain, will destroy the understanding for a time, and some times permanently. Mr. Xaddock speaks of lunacy as a disease. (2 ad. Chan. 727.) Lord Hardwicke says: “Lunatic is a technical word, coined in more ignorant times, as imagining that those persons were affected by the moon; but it is discovered by philosophy and ingenious men, that it is entirely owing to a defect of the organs of the body.” (3 Atkins 174.) And the learned authors of the JVew Medical Jurisprudence, observe that “ congenital idiotcy, or idiotcy de mtivitate, arises from a malformation of the cerebral organ.’* (1 Paris and Fonblanque 308.) It is a subject, however, pa which different opinions are entertained. A respectable writer observes, “some writers contend that insanity is wholly a disease of the mind and not of the body, whereas others suppose that mania in general, depends on physical origin, or arises from disorganization or morbid action of some part of the body; derangement of the intellectual faculties being only the effect. Which supposition is somewhat supportedby the appearances frequently to be observed in the head, upon dissection.” ( Thomas’ Practice 480.)
Here, again, we have the highest evidence of the existence of a physical cause, ascertained by actual dissection. Dr. Zimmerman, indeed, who says be visited all the hospitals in France, thought that the maniacs might be distributee?- *253 Into three classes, — the men who became po through pride, the girls through love, and,the women through jealousy; (Paris & Fonblanque, 326.) Now, admitting this conjecture to be correct, it does not prove that these diseases did not result from a defect of physical organization. The affection of the mind might operate as an exciting cause, as it may of fever or any other disease. And still it may affect only those where there is only an organic defect. For men may be proud, girls in love, and wives jealous, and not be perfect maniacs. But these observations can only tend to shew what indeed it was my wish to shew, how unprofitable such an en-quiry must be. If it be a question which has baffled the research, and divided the opinions, of the most profound physic ologists, how inadequate must -we be to decide it. 1 f how..ever, we can not ascertain the .cause we know the effect. It is to deprive the purchaser of the benefit of his purchase, which it was the intention of the warranty to secure to him. The same author, above quoted, further remarks, that every species of madness, whether originating in the mind or body, becomes the same by continuance. Both th’e mind and body must ultimately be diseased. For a disease of the mind soon produces one of the body. Perhaps there are but few cases where the mind is affected that the body does not participate.
The only practical construction, therefore, that we can give to such a meaning is, that it shall embrace both. And In coming to that conclusion i am satisfied I have adopted the commonly received opinions pn the subject. I have been a little surprised that, looking into the cases which have occur-ed in the other states, where this species of property is owned,. I cannot find a single case where the question has been made. And I presume the cause must be, that no doubt has been entertained upon the subject. All the reasons of policy and pommon honesty would lead ús to adopt that opinion. Disease of the body may be latent and not known to the seller, it is not so with those of the mind. Insanity or idiotcy can ¡at>$ escape the knowledge of the owner}, but may, during the *254 treaty of sale, elude the vigilance of a purchaser. In those cases, therefore, there must usually be actual iraud coupled with a breach oí warranty, which'furnishes an additional reason why we should construe the warranty to extend to a soundness of mind as well as of body.
It is aquestion on which we cannotexpectlightfrom the English books, because slavery is not allowed in that country, Soundncs of property in their law cannot extend to mind, be» cause they are not in the habit of dealing in property possest of intellect. But, I think that the view which I have taken is fully supported by the Civil Law. We ha\e sometimes adopted the Civil Law in opposition to the principles ofthecommqa law; and we may, surely, resort to it in a case to which the common law does not extend; particularly to ascertain the application of a word derived from the Roman language. The. word Semitas is rendered, health, soundness of body, mind, wit and memory; Sanus, whole, healthful, sound in health sound of memory, in his right mind. (Young’s Dictionary.(a) Woodesonff speaking of the Roman Jurists, by whose laws he says human beings are frequently regarded as objects of sale, introduces this question: (Dig. de cont. empt. ¿•■43. § 1. Si quis hominem luminibus effossis emat et d(t sanitate stipuletur, de cetera parte corporis potius stipulaiug videtur, quatn de eo, in quo sc ipse decipiebat. See also 1 Do< mat, 85. likewise Horace, B. ', Sat. 3. where it is laid down that if a person sell a slave, warranting him to be sound generally, using the word sanus the seller must specially except soundness of mind, if he intends to avoid a lat$ suit.
______-_— Sanus utrisque,

Jiuribus atque oculist mentemniai litigiosas?

Mccciperet dominus, cumvenderet.

Our word Sanity, which we generally use to express á soundness of mind, is nothing more nor less than “ savitas,”-with an English termination, which is here used with refer-
W*.... ,i, . ..i-. ■ i. » *255 enee ta a bodily mfirm'ty, and which has acquired that limited sense, in our language, from use alone. The plain English word sound, unless restricted by the adjunct body or mind is considered as embracing both. And the long use of it in that sense, in instruments of this nature, ought now to sanction that construction of it. For, usus jus est, e.t norma loquen di. I think, therefore, that in any view of the subject, th v/arrantyin both cases, has been broken, and that the verdicts ought to be supported.
J. ■ . Starke and Clarke, for the motion.
Peareson and De Saussure, contra.
The motions therefore, in both cases, are refused, (b)

 Soundness implies m,ens sana incorpore sano.

 In concurrence with the opinion of the court, are the following 'authorities from the Civil Law writers, and from some of the classics.
“Qui -vendunt mancipia, solent hoc adjicere, sanu's corpore et animo. Juris erat apud Veteres, ut cum servum distraheret quis, ejus omnia vitia,vel animi, vel corporis publicaret. (Vet.Schol. Hor. Ed. Gesneri. Lips. 1762.)
See also Dig. Lib. 21. Tit. 1. §. 1. de JEdilitio Edicto, where it is laid down: t4 Qui mancipia vendunt, certiores faciant cmptorcs, quid morbi, vitiive cuique sit, quis fugitivus, errove sit, noxave solutus ifon sit, eadsmque omnia, cum ea mancipia venibunt, palam rectc pronuncianto.

“Causa hujus edictiproponendi est, ut occurraturpalladia ven-¡dentium, et emptoribus succurratur, quicunque dcccpti a Venditori-hue fuerint: dummodo sciamus venditorem, etiam si ignoravit ea, quos ¿Ediles praestan jubent, tamen teneri debere: nec est hoc iniquum, potuit enim ea nota habere venditor: ñeque enim interest Smptoris, cur fallatur, ignorantia Venditoris an calliditate.

§8 i!Proindesi quid tale fueritvitiisive morbi, quod usummift-isteriumque hominis impediat, id dabit redhibitioni locum.

That Morbum includes diseases of the mind as well as those of the body, will appear from the words ofSabinus: “ Euriosus, mu-iusve cuive quod membrum lacerum, laesumque, est aut obest quo ' ‘minus ipse aptus sit, morbosi sunt. (Aulus Gellius Lib. 4. Cap. 2.) See also the Commentaries of Voet and Noodt, to Lib. 21. Tit. 1, of flic Digest.
In the following case we think the purchaser was hard to please.

Ad Gargilianum, falsum venditorem.

Mario dicius erat, viginti millibus emi.

Ecddc mihi nuinmos Gargiliane: sapit.